UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF KENTUCKY
PIKEVILLE DIVISION

IN RE:

CLEARWATER NATURAL RESOURCES, LP, et al.

DEBTORS                                          CASE NO. 09-70011
                                                 CHAPTER 11


MILLER BROS. COAL, LLC                                  PLAINTIFF

VS.                                              ADV. NO. 09-7007

CONSOL OF KENTUCKY, INC.                                DEFENDANT

### MEMORANDUM OPINION

This matter is before the court for determination of damages owed to the Plaintiff by the Defendant following the trial conducted herein on August 24-26, 2009 and September 3, 2009. The Plaintiff, one of the jointly administered Debtors, filed its Complaint on May 18, 2009, seeking a judgment on various counts based on the Defendant's declaration of *force majeure* under the parties' contract mining agreement. Upon trial of the matter, the court determined that the Plaintiff should prevail upon its Complaint, and that the only issue remaining was the amount of damages.

1. Background

The parties entered into Joint Stipulations of Uncontested Fact, which provide in pertinent part as follows:

> 4. In August 2005, Miller Bros. was acquired by, and became a wholly-owned subsidiary of, Clearwater Natural Resources, LP ("Clearwater") . . .
> 5. By the time Clearwater acquired Miller Bros., Consol

1

and Miller Bros. were parties to a 2004 contract mining agreement related to the Miller Creek Mine in Mingo County, West Virginia . . .
 . . .

 7.   Clearwater acquired the Knott Floyd Land Company ("Knott Floyd Land") in October , 2006, and Knott Floyd Land was then merged into Miller Bros.

 8.   Knott Floyd Land and Consol are parties to a Lease Option Agreement dated September 18, 2006 . . .

 9.   The Lease Option Agreement gave Knott Floyd Land an exclusive option, subject to certain conditions, for a five-year period to enter into one or more leases on Consol's property within a large, described area to mine up to five million tons.

10.   On February 4, 2009, Miller Bros. submitted a Mine Development Notice to Consol requesting a lease for surface coal mining under the Option Agreement in the area located in Knott County, Kentucky that is commonly referred to as the Yellow Mountain area . . .

11.   On February 19, 2008, Consol responded to the Mine Development Notice by refusing to grant such a lease due to Consol's 'existing subsurface mining operations and mine plans' in the Yellow Mountain area . . .

12.   From mid-2008 through the third quarter of 2008, global coal prices were at historically high levels and demand for coal was very strong.

13.   Following Consol's refusal to grant a lease for surface coal mining to Miller Bros. under the Option Agreement, on June 6, 2008, Miller Bros. proposed that Consol (1) grant Miller Bros. a lease for surface mining in the Yellow Mountain area and (2) execute a contract mining agreement with Miller Bros. to mine the underground reserves through the highwall mining method.

14.   By late summer 2008, Consol and Miller Bros. had orally agreed the Consol would pay Miller Bros. $40.00 per ton on a clean coal basis for coal mined through the highwall method, provided a mutually agreeable contract could be drafted.

15.   In late August 2008, Miller Bros. insisted that the contract fee be increased to $45.00 per ton.

16.   Consol agreed to the last-minute price increase of $5.00 per ton.

17.   On September 8, 2008, Consol and Miller Bros. executed

. . . a Contract Mining Agreement ("CMA") . . .

18. The CMA provides that Miller Bros. will (1) mine and remove coal from the Hazard #8 seam [Yellow Mountain] through the surface/highwall mining method; (2) load and deliver such coal to Consol's Jones Fork Preparation Plant or Consol's Jones Fork Direct Ship Facility; and (3) perform all other work ancillary to such mining, removal, and delivery of coal including, but not limited to, all reclamation obligations and surface maintenance necessary for a complete Phase III bond release of the applicable permits and all mitigation requirements required by such permits.

19. The term of the CMA expires at the earliest date of three years from September 8, 2009, the date of the termination or cancellation of the CMA, or the date upon which all mineable and merchantable coal in the reserves is exhausted.

20. Consol drafted the force majeure provision in Article XVI of the CMA.

21. The language of the force majeure provision in the CMA was not altered in negotiations between Consol and Miller Bros.

22. Under the CMA, Consol was to pay Miller Bros. a fixed fee of $45.00 for every clean ton of coal delivered to Consol's Jones Fork Facility in Mousie, Kentucky in 2009 and 2010, subject to any adjustment for raw ash quality.

23. Consol's Jones Fork Facility is comprised of the (1) Jones Fork Preparation Plant; (2) the Jones Fork Direct Ship Facility; and (3) the Consol-operated Jones Fork deep mine ('Jones Fork Mine') and was built in the early 1990s.

24. Miller Bros. and ICG Addcar Systems, Inc. ("Addcar") executed a CMA dated September 12, 2008, whereby Addcar would provide services to produce coal by the highwall mining method at Yellow Mountain ("Addcar Agreement").

25. Pursuant to the Addcar Agreement, Miller Bros. agreed to pay Addcar $9.50 for every ton of raw coal produced when production in any given month was 100,000 raw tons or greater.

26. At the time of contracting with Miller Bros., Consol had corehole date collected by Consol and third parties reflecting the quality of the coal to be produced at Yellow Mountain.

27. In 2009, Consol shipped coal from the Jones Fork prep

plant that was mined at the Jones Fork Mine as well as from seven (7) contract miners, including Miller Bros.

28. The Central Appalachian operating division of Consol includes coal preparation at the preparation plant at Jones Fork in Kentucky, and the Fola, and Miller Creek preparation plants in West Virginia.

29. Miller Bros. started producing and delivering coal to the Jones Fork Preparation Plant pursuant to the CMA in December 2008.

30. Miller Bros. produced and delivered to Jones Fork the following raw and clean tons in each of the following months:

|  | Raw | Clean |
|---|---|---|
| December | 39,374.67 | 16,270.78 |
| January | 63,142.94 | 27,132.93 |
| February | 72,596.52 | 30,793.86 |
| March | 85,065.83 | 35,312.45 |
| April | 88,187.33 | 37,584.27 |

31. In 2008, Consol sold approximately 2,500,000 tons of coal at Jones Fork to twelve (12) customers.

32. Consol was unable to fulfill all committed orders for coal from Jones Fork in 2008 and there was the possibility that some of these tonnages would be shipped to those customers in 2009.

33. Consol never entered into any contracts specifically for the sale of coal to be mined by Miller Bros. pursuant to the CMA ('Yellow Mountain Coal'), but coal mined by Miller Bros. was included in coal that was sold from the Jones Fork Facility.

34. Representatives of Consol met with representatives of Miller Bros. on May 14, 2009 at Jones Fork and discussed the problem of associated with the amount of coal stored in the stockpiles at Jones Fork.

35. On May 15, 2009, Dave Smith, Consol's Supervisor on Contract Mining, delivered a letter to Gene Campbell, Miller Bros.' Vice President of Engineering claiming force majeure under the CMA . . .

36. Consol claimed three events of force majeure: (1) Consol's stockpile area at the Jones Fork Preparation Plant was full because market conditions had limited its ability to sell coal, (2) customers of Consol were not taking all the coal they had contracted to purchase and (3) Consol would be idling the plant on June 30, 2009.

    37. On May 15, 2009, Miller Bros. notified Addcar of a force majeure under the Addcar Agreement as a result of Consol's notice of force majeure . . .

    38. Miller Bros. and Addcar terminated the Addcar Agreement as of June 17, 2009.

    39. On June 29, 2009, notice pursuant to the Worker Adjustment and Retraining Notification Act ('WARN Act') was issued stating that the Jones Fork Mine would be idled at the end of July 2009 . . .

    40. Consol has idled the company-owned mine at Jones Fork.

Pursuant to the terms of the CMA the Plaintiff undertook to mine or provide for the mining of coal by the surface and highwall methods, and complied with its obligations under the CMA.

Article XIV of the CMA sets out a *force majeure* provision which defines that term as

> . . . any event or circumstance that is beyond the reasonable control of the party asserting force majeure, and not due to the fault or negligence of the party asserting force majeure . . . The refusal, failure or inability of any customer(s) of COK to receive and purchase from COK quantities of Coal mined by Contractor hereunder which such customer(s) had committed to receive and purchase from COK shall constitute a force majeure event excusing COK's performance hereunder.

No specific customer for the coal mined by Plaintiff was identified in the CMA and the coal was not dedicated to any specific customer in accordance with the testimony. The Defendant claimed the three events of *force majeure* set out above relieved it of its contract obligations under the CMA. The Defendant filed an Emergency Motion for Relief From the Automatic Stay in this case on May 15, 2009, seeking "in an abundance of caution . . . to eliminate any doubt of its ability to avail itself of its *force majeure* right." The Defendant was never granted relief from the stay. After trial of this matter, the court

agreed with the Plaintiff that the events set out above do not constitute *force majeure* events, but rather are normal market risks, and that the *force majeure* provision of the Agreement does not shield the Defendant from these risks. The wrongful declaration of *force majeure* constitutes a breach and effective repudiation of the CMA, entitling the Plaintiff to damages.

    2.   <u>Discussion</u>

        A.   <u>Liability</u>

The Plaintiff contends that no event constituting a *force majeure* under the CMA occurred. It points to the Kentucky Supreme Court's treatment of the concept in *Ky. Utils. Col v. South East Coal Co.*, 836 S.W.2d 392, 399, Ky. (1992), where the court observed that "a *force majeure* event is commonly considered to be caused by overpowering, superior, or irresistible force, such as an act of God, which is beyond the reasonable control of the parties and cannot be avoided by the exercise of due care." *Id.* at 400. The party asserting *force majeure* has the burden of proving the event was beyond its control and not due to its fault or negligence. *See Gorman v. Lusk*, 109 S.W.2d 625, Ky.App. (1937); *Gulf Oil Corp. v. F.E.R.C.*, 706 F.2d 444 (3rd Cir. 1983). There was no disagreement that the basic *force majeure* language included in the CMA is standard in the coal industry and in the Defendant's contracts. The parties apparently did not engage in any significant negotiation of the language in regard to any particular concern.

The Plaintiff contends that the three events set out in Joint Stipulation 36 do not constitute *force majeure* events, but are normal market risks, and the *force majeure* provision of the CMA does not

protect the Defendant from such risks.  Further, the Plaintiff contends that any difficulties the Defendant experienced in its efforts to sell coal from the Jones Fork Facility were caused by its own failures to secure adequate commitments in 2008 for the sale of such coal in 2009, and by its choice to bid prices for the sale of its coal that were higher than prevailing market prices.  The Plaintiff points out that the Defendant's claimed events of *force majeure* are in fact complaints about a change in the market.  The severe downturn in the coal market was the direct cause of each of the claimed events of *force majeure*: less demand for coal from customers, rising inventories at Jones Fork, and the decision to idle the Jones Fork Preparation Plant.  As the Plaintiff states, "No other superior forces [were] at work."

   The Defendant's assumption of normal market risks is evidenced by its entering into the CMA, a fixed-price contract.  In so doing, it expressly assumed normal market risks, such as a downturn in the coal market and a reduction in demand and/or coal prices.  In *N. Ind. Pub. Serv. Comm. v. Carbon Cty. Coal Co.*, 799 F.2d 265 (7th Cir. 1986), the court, in interpreting a contractual *force majeure* provision, recognized that "the normal risk of a fixed-price contract is that the market price will change."  *Id*. at 275.  The Plaintiff points out that Exhibit C to the CMA, which deals with the fees to be paid to the Plaintiff under the contract, states that the fees are "Fixed fees which will not change to reflect changes in market value" of the coal produced.  Therefore, the Plaintiff maintains, the Defendant specifically agreed that changes in the price of or demand for coal would not relieve the Defendant of its obligation to pay the Plaintiff

7

the fees outlined in Exhibit C or serve as a basis for reduction of those fees.

The court believes that the fixed-price nature of the CMA is the determinative element in this matter. The Defendant contracted with the Plaintiff, promising to pay it to mine coal. When market forces made this arrangement unprofitable for the Defendant, it attempted to relieve itself of the burden of its agreement with the Plaintiff by declaring a *force majeure* event. It is clear this supposed *force majeure* event amounted to a precipitous drop in the price of coal and Defendant's failure to secure new contracts to sell the coal and attendant consequences. The *force majeure* provision of the CMA did not protect the Defendant from such market risk, and it must be held liable for the damage its declaration caused the Plaintiff.

B.  Damages

The Plaintiff contends that it is entitled to loss of profits under the CMA. The measure of damages for breach of contract is "that sum which will put the injured party into the same position he would have been in had the contract been performed." *Hogan v. Long*, 922 S.W.2d 368, 371, Ky. (1995) (quoting *Perkins Motors, Inc. v. Autotruck Fed. Credit Union*, 607 S.W.2d 429, 430, Ky.App. (1980)). The proper measure of damages here is lost profits. In *New v. Kinser*, 115 S.W.2d 1054, 1055, Ky.App. (1938), the court found that if the breaching party prevented the non-breaching party from mining the agreed upon amount of coal, the measure of the non-breaching party's damages should be calculated by showing the quantity of coal it could have produced, the probable cost and expense, and the net profits. *Id.*

The non-breaching party seeking to recover lost profits must

prove that its lost profits were reasonably foreseeable at the time the parties entered into the contract. *Ky. Consumers Oil Co. v. Gen. Bonded Warehousing Corp.*, 184 S.W.2d 972, 974, Ky. (1945). It must further demonstrate the amount of its lost profits to a reasonable degree of certainty. As stated by the court in *Ill. Valley Asphalt, Inc. v. Harry Berry, Inc.*, 578 S.W.2d 244, Ky. (1979):

> Loss of anticipated profits as an element of recoverable damages is fully recognized in Kentucky. Mere uncertainty as to the amount will not preclude recovery. There must be presented, however, sufficient evidence on which a reasonable inference as to the amount of damage can be based.

*Id.* at 245-46 (Internal citations omitted). The Plaintiff claims $9,479,538.95 in lost profits as a result of the Defendant's breach of the CMA, and $8,152,422.65 in revised net damages.

The lost profits were calculated by the Plaintiff's expert, Emily S. Medine ("Medine"), in her Expert Report ("Medine Report")(Tr. Exh. 98). In her reports, Medine used a recovery rate of 42% but Defendant's expert argues that that rate should be 40%, the apparently conservative rate the Plaintiff was using in its estimates of recovery going forward. The evidence clearly shows the actual recovery rate was 42% which Medine used in her calculations. That rate is supported by the evidence and the court is unable to agree with the Defendant's expert that the rate was declining as mining progressed. Medine calculated the revised net damages in her Rebuttal Expert Report ("Rebuttal Report")(Tr. Exh. 161), which was a response to the expert report prepared for the Defendant by Gleason & Associates, P.C. ("Gleason Report") (Tr. Exh. 140) concerning damages due the Plaintiff. Medine arrived at the revised net damages figure by

subtracting certain offsets from the total damages claimed, $10,240,582.28. In addition to lost profits, the Plaintiff claimed $629,287.33 in incremental reclamation liability and $131,756.00 for a shortfall payment to Addcar, the entity that contracted with the Plaintiff to perform highwall mining, for a total of $10,240,582.28 in damages.

The offsets applied were $221,147.20 for development cost reimbursement, $60,011.52 for permitting cost reimbursement, $278,472.90 for gas line relocation costs, and $1,528,527.92 for in lieu fees. The offsets total $2,088,159.62, resulting in revised net damages of $8,152,422.65, as set out above. These revised net damages were based on Medine's use of a ten percent discount rate. She states that the ten percent rate used in her damage calculation was based on the Debtor's actual cost of capital which had been under eight percent until its bankruptcy filing combined with a slight risk premium. She further states that the discount rate she employed is consistent with the effective annuity nature of the income stream under the CMA, given the fixed price and costs. However, the court believes a ten percent rate is too low. A fifteen percent discount rate is more reasonable in light of the normal attendant risks of mining coal, and results in net damages of $8,015,600.00. At the conclusion of the trial of this matter, the parties announced a partial settlement in regard to damages related to reclamation obligations to be assumed by Defendant. This settlement resulted in a $1,561,063.00 reduction in reclamation costs which would not be incurred by the Plaintiff, reducing its damages to $6,454,537.00.

Further adjustments must be made to the net damages. Medine

responded to the Gleason Report's criticism of several aspects of the Medine Report, i.e., that she had failed to assume the Yellow Mountain surface mining operations in her calculations, and that she had made inappropriate assumptions for future production, recovery rates, delivery of tons, and the future price of coal. Medine states that she did consider the Yellow Mountain surface mining operations in her analysis, but concluded that it would break even and would not impact the damages incurred by the Plaintiff. The court does not agree. Losses on the surface operations were forecast by Plaintiff to be $751,610.00 in 2009 and $1,663,569.00 in 2010, for a total of $2,685,095.00. The evidence showed that in the last few weeks of mining the surface mining operation was less likely to produce the losses originally forecast. As with the conservative recovery rate Plaintiff used in its projections, the court believes that the Plaintiff's estimate of losses on surface mining were conservative and that those losses would be somewhat less than the projections based on the actual operations and recovery rates and fixes those losses at $2,000,000.00.

Finally, additional Addcar costs in the amount of $540,000.00 would have been payable during the latter stages of the Addcar contract as an increase in fees per ton. It appears that these costs would have been incurred pursuant to provisions of the contract between Plaintiff and Addcar which would require such payments to Addcar if it continued to perform the work it contracted to do for the Plaintiff. These costs will not be incurred, and must be deducted from the net damages. The court will discount this amount to its present value, $490,000.00. The reductions of $2,000,000.00 for

11

surface operations loss and $490,000.00 for Addcar costs results in a final net damages total of $3,964,537.00.

The court finds the Medine Report and the Rebuttal Report convincing, with adjustments made as set out above.  The court believes that the evidence offered by the Plaintiff, including testimony elicited at trial from its expert and others and documentary evidence, supports its claim for damages.  The court will by separate order award the Plaintiff revised net damages in the amount of $3,964,537.00.  Counsel for the Plaintiff is directed to prepare a judgment.

              C.    <u>Violation of the automatic stay</u>

The Plaintiff also seeks a declaratory judgment that the Defendant's improper declaration of *force majeure* is a violation of Bankruptcy Code section 362(a)(3).  The Plaintiff contends that the Defendant's action is punishable as contempt and subject to an award of sanctions.  Section 362(a)(3) provides that the filing of a bankruptcy petition operates as a stay of "any act or obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate. . ."  11 U.S.C. § 362(a)(3).  The Plaintiff maintains that the declaration of *force majeure* is tantamount to the termination of the CMA, and that the unilateral termination of an executory contract is a violation of the automatic stay.  *In re Nat'l Envtl. Waste Corp.*, 191 B.R. 832 (Bankr. C.D. Cal. 1996), *aff'd* 129 F.3d 1052 (9th Cir. 1997).

The Plaintiff addresses the application of *Citizens Bank of Md. v. Strumpf*, 516 U.S. 16, 116 S. Ct. 286 (1995), countering the argument that this case stands for the proposition that mere breach of

contract is not a violation of the automatic stay.  There the Court held that a creditor of the debtor, in order to protect its setoff rights, may temporarily withhold payment of a debt it owes to the debtor without violating the automatic stay.  The petitioner bank's "administrative hold" on the debtor's checking account was not a setoff within the meaning of §362(a)(7) since the bank simply refused to pay its debt temporarily while it sought relief from the stay.  The bank did not permanently reduce the debtor's account balance by the amount of the defaulted loan.  The Court further was not convinced that the "administrative hold" violated §§362(a)(3) and (6), since reliance on these subsections assumes that the "administrative hold" took something from the debtor or exercised dominion over  property that belonged to him.  *Id.*

The Plaintiff points out that the Supreme Court reasoned that the hold on the debtor's bank account did not constitute an exercise of dominion over the debtor's asset, as a bank account is merely a promise to pay.  In the within matter, the CMA is an asset of the estate, and the *force majeure* declaration constitutes an exercise of control over the contract so as to deprive the Plaintiff of its use and value.  In *Cohen v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.)*, 138 B.R. 687 (Bankr. S.D. N.Y. 1992), the court held that "executory contracts are property of the estate within the meaning of §541." *Id.* at 702.  In arriving at that conclusion, the court stated: "'Contractual rights are intangible property which is included within the definition of the estate of the debtor.'" *Id.*, quoting *LTV Corp. v Aetna Cas. & Sur. Co. (In re Chateaugay Corp.)*, 116 B.R. 887, 898 (Bankr. S.D. N.Y. 1990).

The court believes that the Plaintiff has demonstrated that the Defendant's action in declaring a *force majeure* event rises to the level of a violation of the automatic stay, and that the Plaintiff should have a declaratory judgment to that effect. Despite the violation of the automatic stay and because of the damages awarded above, the court does not believe the imposition of further sanctions is appropriate. Counsel for the Plaintiff is directed to prepare an order.

Copies to:

James A. Reeder, Jr., Esq.
Mary L. Fullington, Esq.
Sally E. Edison, Esq.
John Lucian, Esq.
U.S. Trustee

14

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
**The affixing of this Court's electronic seal below is proof this document has been signed by the Judge and electronically entered by the Clerk in the official record of this case.**



**Signed By:**
*William S. Howard*
**Bankruptcy Judge
Dated: Friday, December 11, 2009
(wsh)**